John GREGORICH, Plaintiff–Appellee,

v.

Carl A. LUND, in his individual capacity, Darryl Pratscher, in his individual capacity, and Shirley K. Wilgenbusch, in her individual capacity, Defendants–Appellants,

and

Supreme Court of Illinois, by William Madden, Acting Director of the Administrative Office of the Illinois Courts, Frederick S. Green, in his official capacity, Defendants.

No. 94–2505.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1994.

Decided May 9, 1995.

Rehearing Denied June 26, 1995.

Bryan F. Savage, Urbana, IL, John Gregorich (argued), Auburn, IL, for John Gregorich.

Kathy Shepard, Office of Atty. Gen., Crim. Appeals Div., Springfield, IL, Michael Vujovich (argued), Administrative Office of Illinois Courts, Springfield, IL, for Carl A. Lund, Darryl Pratscher and Shirley K. Wilgenbusch.

Before RIPPLE and MANION, Circuit Judges, and SKINNER, District Judge.*

RIPPLE, Circuit Judge.

John Gregorich, a former research attorney for the Appellate Court of Illinois, Fourth District, brought this action under 42 U.S.C. § 1983 against Carl Lund, the former Presiding Justice of that court. Mr. Gregorich alleged that Justice Lund fired him for engaging in union-organizing activities. Mr. Gregorich also alleged a defamation claim, based on state law, against Darryl Pratscher

---

* The Honorable Walter Jay Skinner of the United States District Court for the District of Massa- chusetts is sitting by designation.

and Shirley Wilgenbusch. He alleged that their false statements proximately caused his termination. The district court denied Justice Lund's claim of qualified immunity and retained the state tort claim under its supplemental jurisdiction. For the reasons that follow, we reverse in part, and remand.

# I

## BACKGROUND

### A. *Facts*

John Gregorich began working as a staff research attorney for the Appellate Court of Ilinois, Fourth District in December 1981. Prior to January 1, 1991, the court's leave policy allowed employees to carry over unused vacation days into the next calendar year. The policy also entitled employees to compensation for unused vacation time in the event of termination. On November 26, 1990, the Illinois Supreme Court changed the leave policy. The amended policy allowed employees to carry over no more than ten days from year to year. Although the new policy became effective January 1, 1991, it applied retroactively. It thus prevented Mr. Gregorich from receiving benefits for sixty-seven of the seventy-seven vacation days he had previously accumulated.

Mr. Gregorich and his fellow research attorneys were unhappy with the new rule. In an effort to change it, Mr. Gregorich began, in February 1991, a union-organizing campaign among the research attorneys of the Fourth District. He also discussed unionization with employees in the Clerk's Office. In April 1991, Mr. Gregorich and another research attorney signed unionization cards authorizing the Teamsters to represent them. However, the Teamsters subsequently withdrew their representation petition that had been pending before the Illinois Labor Relations Board. On November 20, 1991, Carl Lund, then the Presiding Justice of the Fourth District, discharged Mr. Gregorich on grounds of insubordination. Shirley Wilgenbusch, Research Director for the Fourth District, and Darryl Pratscher, Clerk of the

Court, apparently had informed Justice Lund that Mr. Gregorich was acting in a "rude or discourteous manner." R.1 at 9. Mr. Gregorich believed that these allegations were pretextual and that he had been fired in retaliation for his union-organizing activities.

### B. *Earlier Proceedings*

Mr. Gregorich filed a two-count complaint against several defendants. The first count named as defendants the Illinois Supreme Court and William Madden, the Acting Director of the Administrative Office of the Illinois Courts. It alleged that these defendants had violated the Contracts Clause, as well as Mr. Gregorich's procedural and substantive due process rights, by changing retroactively the leave policy. Mr. Gregorich's second count consisted of a wrongful discharge claim against Justice Lund, Ms. Wilgenbusch, and Mr. Pratscher, in their individual capacities. It also included a defamation claim against the latter two defendants. The federal claims involved in this count centered around Mr. Gregorich's rights of free association and substantive and procedural due process. The portion of this count that articulates the First Amendment claim central to this appeal states:

> By terminating plaintiff's employment with the Fourth District Appellate Court in part because of a personal desire to retaliate against plaintiff for engaging in union activities and to discourage other employees of the Fourth District Appellate Court from engaging in union activities, defendant CARL A. LUND, acting under color of State law, violated plaintiff's right of free association guaranteed by the First and Fourteenth Amendments of the United States Constitution.

R.1 at 15, ¶ 62. Mr. Gregorich sought compensatory and punitive damages from the three defendants. He also sought an order of reinstatement.

The defendants filed a motion to dismiss. The district court dismissed Mr. Gregorich's first count in its entirety.[1] The court also

---

1. In a footnote, the court noted that, although Justice Green, Justice Lund's successor, appeared to be a defendant, "his name does not appear in either the 'Facts' section or the 'Legal Claims' section of the complaint." R.21 at 3 n. 3. It then stated that "[e]ither the plaintiff fails

dismissed all of the claims in the second count except Mr. Gregorich's First Amendment and procedural due process claims against Justice Lund and his defamation claim against Wilgenbusch and Pratscher. These remaining defendants then moved for summary judgment on the issues that had survived their motion to dismiss. The district court granted Justice Lund's motion with respect to the procedural due process claim. It held that Mr. Gregorich was an "at will" employee. However, the court denied summary judgment on the remaining issues. First, it determined that there were genuine issues of material fact concerning whether Justice Lund discharged Mr. Gregorich in retaliation for his union-organizing activities. Assuming that Mr. Gregorich's discharge was at least partly due to his union-organizing efforts, the district court then held that Justice Lund was not entitled to qualified immunity because the "First Amendment right of public employees to speak and assemble around union issues is well-established." R.46 at 3–4. Likewise, the court determined that genuine issues of material fact existed with respect to the defamation claim, and chose to retain this state law claim under its supplemental jurisdiction.

# II

## DISCUSSION

A. *Qualified Immunity*

1.

■ Government officials who deprive an individual of constitutionally protected rights while acting under the color of state law are subject to personal liability for damages. *See* 42 U.S.C. § 1983. However, officials performing discretionary functions may avoid such liability by invoking the defense of qualified immunity, a powerful shield that

insulates officials from suit as long as their conduct does not violate a "clearly established" constitutional right "of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[2] The plaintiff bears the burden of proof on the issue. *McGrath v. Gillis,* 44 F.3d 567, 570 (7th Cir.1995); *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). Accordingly, when considering a defense of qualified immunity, we inquire "whether the plaintiff has asserted a violation of a constitutional right at all," *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), and also whether the plaintiff has demonstrated that the applicable constitutional standards were clearly established at the time in question. *See Zorzi v. County of Putnam,* 30 F.3d 885, 892 (7th Cir.1994) (delineating the two-part test); *Rakovich,* 850 F.2d at 1210. Although the plaintiff must allege the violation of a right "sufficiently particularized" to enable the district court to determine whether the defendants were on notice that their actions violated clearly established law, *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), he need not show that the very action in question has previously been held unlawful. *Id.; Bakalis v. Golembeski,* 35 F.3d 318, 323 (7th Cir.1994) ("[T]he right should not be defined so intricately that invariably guiding law never can be found.") (quoting *Rakovich,* 850 F.2d at 1211).

■ Justice Lund contends that it was not clearly established at the time Mr. Gregorich was terminated that judicial research attorneys had the right to engage in union-organizing activities.[3] Mr. Gregorich responds

to state a claim against this defendant or this defendant is presumed to be included in Count I and, like William Madden, immune from suit. Under either interpretation, the defendants' motion to dismiss the complaint as to Frederick S. Green is properly granted." *Id.* Mr. Gregorich has not appealed this ruling.

**2.** *See also Elder v. Holloway,* — U.S. —, —, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994); *Maltby v. Winston,* 36 F.3d 548, 554 n. 6 (7th

Cir.1994) (stating that qualified immunity "is not merely a defense to liability but an immunity from suit"), *cert. denied,* — U.S. —, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995).

**3.** In the district court, Justice Lund disputed Mr. Gregorich's claim that he was discharged for engaging in union-organizing activities. However, Justice Lund concedes for purposes of this appeal, as he must, *see McGrath v. Gillis,* 44 F.3d 567, 569 (7th Cir.1995) (noting that the court has

that this right was clearly established. We review the district court's decision to deny Justice Lund qualified immunity de novo. *Bakalis*, 35 F.3d at 322.

### 2.

 To determine whether it was clearly established that Mr. Gregorich had a right to engage in union-organizing activities, we must identify the nature of his claim and the legal standards that govern it. Mr. Gregorich's claim is grounded in the First Amendment right of free association. *See NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958); *see also Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984). When a public employee alleges that he was fired in violation of his constitutional right to associate freely with others, we analyze his claim under the approach announced by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and reiterated in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See Griffin v. Thomas*, 929 F.2d 1210, 1212–14 (7th Cir.1991).[4] In *Pickering*, the Court noted that individuals do not relinquish their First Amendment rights "to comment on matters of public interest" simply by accepting public employment. 391 U.S. at 568, 88 S.Ct. at 1734–35. However, when the State acts as an employer, it "has interests . . . in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* Thus, "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.; see also United States v. National Treasury Employees Union*, ── U.S. ──, ──, 115 S.Ct. 1003, 1013, 130 L.Ed.2d 964 (1995) (reiterating the standard); *Connick*, 461 U.S. at 142–46, 103 S.Ct. at 1687–90 (discussing *Pickering*, its antecedents, and its progeny). To be protected, a public employee's expressive activity must "be on a matter of public concern" and his interest in the expression must outweigh the State's interest in promoting the efficiency of its public services. *Waters v. Churchill*, ── U.S. ──, ──, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (plurality opinion of O'Connor, J.) (citing *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687; *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35).

 It is important to underscore the significance that the latter part of the analysis announced in *Pickering* plays in qualified immunity cases. Differences in the nature of the competing interests from case to case make it difficult for a government official to determine, in the absence of case law that is very closely analogous, whether the balance that he strikes is an appropriate accommodation of the competing individual and governmental interests. We must remember that

jurisdiction over an appeal from a denial of qualified immunity that turns on legal uncertainty, but that it lacks jurisdiction over claims that raise defenses on the merits); *Marshall v. Allen*, 984 F.2d 787, 792 (7th Cir.1993) (same), that he discharged Mr. Gregorich for attempting to organize a union.

4. Although *Pickering* focused upon a public employee's right of free speech, while Mr. Gregorich's First Amendment claim focuses upon his right of free association, our Circuit applies the test announced in *Pickering* and *Connick* to both free speech and free association claims. *See Griffin*, 929 F.2d at 1212–14 (reasoning that *Connick* was directed toward expressive activity generally). The Circuits are split on this issue. *Compare Griffin*, 929 F.2d at 1212–14 (holding that *Connick* test applies to both free speech and free association claims) *and Boals v. Gray*, 775 F.2d 686 (6th Cir.1985) (same) *with Coughlin v. Lee*, 946 F.2d 1152, 1158 (5th Cir.1991) (limiting *Connick* to free speech claims and thus not requiring public employees to demonstrate that their associational activity relates to a matter of public concern) *and Hatcher v. Board of Pub. Educ. & Orphanage*, 809 F.2d 1546, 1558 (11th Cir.1987) (same). *See also Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 400 (3d Cir.1992) (recognizing the conflict, but failing to take a position); *Clark v. Yosemite Community College Dist.*, 785 F.2d 781, 791 (9th Cir.1986) (noting that because defendant had not raised the question, the court had no need to decide whether the plaintiff's "right of association with the union touches on a matter of public concern so as to give rise to a cause of action in federal court for a violation of First Amendment rights").

government officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor. *See Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued.") (quotations and internal citation omitted). Thus, in such circumstances, "'the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability.'" *Rakovich v. Wade*, 850 F.2d 1180, 1213 (7th Cir.1988) (en banc) (quoting *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.) (*Benson II*), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986)). Although the protection afforded the government official is indeed substantial, it is not necessary that the plaintiff produce a case that is on "all fours" with the situation at issue. As the Supreme Court said in *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), a plaintiff must allege the violation of a "sufficiently particularized" right, but need not establish that the very action in question has previously been held unlawful.

### 3.

■ We now turn to the application of these principles to the case before us. Initially, we must determine whether Mr. Gregorich's expression touched upon a matter of public concern. "[P]rivate speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer." *National Treasury Employees Union*, — U.S. at —, 115 S.Ct. at 1013. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. The determination whether the associational rights that were exercised touched upon a matter of public concern must be based on "the content, form, and context" of his expression "as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. "[O]ur cases indicate that of these three, content is the most important." *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 409 (7th Cir.1994) (collecting cases). Mr. Gregorich's motive is a relevant, but not necessarily a dispositive consideration. *Id.* at 409–10; *see Smith v. Fruin*, 28 F.3d 646, 653 (7th Cir.1994) ("[W]e do not mean to suggest that merely because the employee has a personal interest in the subject of her remarks, they do not constitute speech on a matter of public concern."), cert. denied, — U.S. —, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995).

■ In this case, Mr. Gregorich's activity consisted of union-organizing efforts among the judicial research attorneys of the Fourth District. Courts have recognized that such activity, in a broad sense, touches upon matters of public concern. *See American Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 301 (D.C.Cir.1987) ("The urge to unionize certainly falls within the category of expression that is 'fairly considered as relating to any matter of political, social, or other concern to the community.'") (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90); *cf. Boddie v. City of Columbus*, 989 F.2d 745, 750 (5th Cir.1993) (noting that "much more of the range of [union] activity than the range of employee speech ... is inevitably of public concern"). However, the fact that an employee's expression concerns a topic of public import "does not automatically" render his expression protected. *Cliff*, 42 F.3d at 410; *see also Boals v. Gray*, 775 F.2d 686, 693 (6th Cir.1985) (stating that an employee's expression, as a matter of law, does not touch upon a matter of public concern "merely because it is union-related"). Therefore, we must probe the record to determine the "precise content, form, and context" of Mr. Gregorich's associational activity. *See*

*Cliff,* 42 F.3d at 410. After reviewing the record, we conclude that Mr. Gregorich's efforts to promote unionization among the research attorneys of the court are, on this record, most properly characterized as touching upon matters of public concern. Mr. Gregorich engaged in his union-organizing effort to effectuate a change in the court leave policy for the benefit of the research attorneys in the Fourth District. The point of his expression was to obtain union representation for all research attorneys. *See Fruin,* 28 F.3d at 651 (noting that our "public concern" inquiry "must also take into account the point of the speech in question" and examine whether it was the employee's "point" to raise an issue because it is of public concern rather than because it is a matter of private interest) (quotation and citations omitted). Mr. Gregorich's expression thus differs from the mostly private complaints brought solely on behalf of an individual that we recently found "entirely personal in nature," even though they related to a subject of public import. *See id.* at 651–52 (determining that public employee's complaint about second-hand smoke in the workplace was a matter of private concern); *see also Cliff,* 42 F.3d at 409, 411 (determining that, although issues of class size and student discipline are matters of public concern, teacher's complaints were addressed "only to the personal impact of those issues" on her, and noting that she "was not speaking for other teachers"). Although Mr. Gregorich's union-organizing efforts were motivated, in part, by his desire to regain his lost benefits, the record here supports a conclusion that his attempt to obtain representation for all research attorneys in the Fourth District went beyond his self-interest and made his activity subject to the requirements of *Pickering* and *Connick.*

Having determined that Mr. Gregorich's expression involved a matter of public concern, we must now evaluate whether, at the time that Justice Lund acted, the existing case law, reasonably read, clearly established that Mr. Gregorich's interest in union-organizing outweighed the State's interest in the efficiency of its court system. As Mr. Gregorich argues, it is well established, as a general proposition, that public employees have the right to associate with each other to address issues of mutual concern and of public importance.[5] It is clear, however, that this right is not an absolute one and is subject to the countervailing concerns of governmental interest contemplated by *Pickering* and *Connick.* One of these interests was set forth clearly by the Supreme Court of the United States in *Pickering:*

> It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined.

391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3; *see also Rankin v. McPherson,* 483 U.S. 378, 390, 107 S.Ct. 2891, 2900, 97 L.Ed.2d 315 (1987) ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."); *Connick,* 461 U.S. at 151, 103 S.Ct. at 1692 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.").

Therefore, although at the time Justice Lund acted, a public employee could associ-

---

**5.** *See, e.g., Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 465, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979) (per curiam) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so."); *Boddie v. City of Columbus,* 989 F.2d 745, 748 (5th Cir.1993); *Morfin v. Albuquerque Pub. Schs.,* 906 F.2d 1434, 1438 (10th Cir.1990); *Mis-*

*souri Nat'l Educ. Ass'n v. New Madrid County R–1 Enlarged Sch. Dist.,* 810 F.2d 164, 166–67 (8th Cir.1987); *Hatcher v. Board of Pub. Educ. & Orphanage,* 809 F.2d 1546, 1558 (11th Cir.1987); *Boals v. Gray,* 775 F.2d 686, 692 (6th Cir.1985); *Hanover Township Fed'n of Teachers v. Hanover Community Sch. Corp.,* 457 F.2d 456, 460 (7th Cir.1972); *McLaughlin v. Tilendis,* 398 F.2d 287, 288 (7th Cir.1968).

ate with other employees, even in a union, on matters of common interest, it was also clearly established that the associational rights of public employees were not without limitation. Among the countervailing governmental interests that have been recognized is the practical reality of governance that those with policy-making responsibilities " 'must have faithful agents.' " *Vicksburg Firefighters Ass'n v. City of Vicksburg,* 761 F.2d 1036, 1040 (5th Cir.1985) (quoting *Beasley v. Food Fair, Inc.,* 416 U.S. 653, 660, 94 S.Ct. 2023, 2027, 40 L.Ed.2d 443 (1974)). In the usual context, this corollary principle is directed at ensuring that those who formulate and those who manage the affairs of government must have the loyalty of those to whom they must delegate that managerial authority. The application of this principle to the judiciary requires that we adjust our perspective to take into account its particular function within our governmental structure. Courts are not like most other institutions of government. Their primary role is not to formulate or to manage programs, but to decide cases. In this process, the relationship of the decisionmaker to those who assist in the task of deciding cases is unique. Although, in some contexts, it involves the delegation of management authority, it more often involves the sharing of intellectual confidences as the judicial officer attempts to arrive at the correct decision required by the law and the facts.

The task is further complicated by the evolving working arrangements that courts across our Nation have implemented, for better or worse, to deal with the staggering case loads that have crushed all courts, but especially our state judiciaries. These new arrangements involve a variety of degrees of participation in the judicial enterprise.

In *Meeks v. Grimes,* 779 F.2d 417 (7th Cir.1985), we noted in the context of a political patronage firing that a judge's chambers are perhaps "[t]he paradigm example" of an environment in which a close working relationship is essential to perform successfully the public function. *Id.* at 423. Other courts and jurists have recognized that those who work closely with judicial officers must be loyal, cooperative, and responsible.[6] Needless to say, confidentiality is essential. As Judge Gewin stated in *Abbott v. Thetford,* "every judge ... knows the importance of a cooperative and confidential relationship with staff members. The absence of either cooperation or confidentiality is disruptive and inevitably impairs the operation of any court." 529 F.2d 695, 705 (5th Cir.) (Gewin, J., dissenting), *rev'd,* 534 F.2d 1101 (5th Cir. 1976) (en banc) (adopting dissent), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977).[7]

The record in this case establishes that, like the judicial assistants referenced in the

---

6. *See, e.g., McDaniel v. Woodard,* 886 F.2d 311, 315 (11th Cir.1989) (holding that state trial judge was justified in dismissing confidential secretary for her refusal to obey direct order, and noting that the judge was not required to " 'tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships' ") (quoting *Connick,* 461 U.S. at 154, 103 S.Ct. at 1693–94); *Balogh v. Charron,* 855 F.2d 356, 356–57 (6th Cir.1988) ("Judicial aides who work in chambers and are assigned to one judge as court officer ... normally handle sensitive information about cases of a confidential nature, information which is not public information. Judges must be able to rely on the confidentiality of the relationship with such aides, just as they must rely on the confidentiality of their relationship with their private secretaries and law clerks."); *Oliva v. Heller,* 839 F.2d 37, 40 (2d Cir.1988) (noting, in an absolute immunity case, that "a law clerk is probably the one participant in the judicial process whose duties and responsibilities are most intimately connected with the judge's own exer-

cise of the judicial function"); *Hall v. Small Business Admin.,* 695 F.2d 175, 176 (5th Cir. 1983) ("Judges' robes must be as spotless as their actual conduct. These expectations extend to those who make up the contemporary judicial family, the judge's law clerks and secretaries."); *Fredonia Broadcasting Corp. v. RCA Corp.,* 569 F.2d 251, 256 (5th Cir.) ("[L]aw clerks may serve as sounding boards for ideas, often affording a different perspective, may perform research, and may aid in drafting memoranda, orders and opinions.... A law clerk, by virtue of his position, is privy to his judge's thoughts in a way that the parties cannot be."), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); *cf.* Gerald Gunther, *Learned Hand* 141 (1994) (noting that Judge Hand referred to his law clerks as "puny judges").

7. *Cf. B.H. v. McDonald,* 49 F.3d 294, 297–98 (7th Cir.1995) (noting, in case involving question of public access to judicial proceedings, that a judge's chambers is "an area traditionally off-limits to the public eyes and ears").

case law cited above, the Illinois Fourth District's research attorneys had a close working relationship with the judges of their court. The research attorneys became privy not only to internal memoranda and draft opinions, but also to the judges' very thought processes. See Tr. II at 16–17 (Mr. Gregorich's statement that he prepared research memoranda and either participated in conference discussions following oral argument or received directions on how to draft opinions from the authoring judge); Tr. IV at 26 (Justice Lund's comment that Mr. Gregorich attended conference discussions and suggested how cases should be decided). Therefore, at the time he acted, Justice Lund was entitled to believe that the unionization of the research attorneys would threaten this delicate working relationship.[8] He was not required to wait for "events to unfold to the extent that the disruption of the office and the destruction of working relationships [was] manifest" before he acted. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692–93.

 We conclude that, at the time he acted, the state of the case law afforded Justice Lund a reasonable basis for concluding that someone with Mr. Gregorich's responsibilities to the court had an obligation to refrain from taking such an adversarial role to the court. We emphasize that it is not necessary for us to determine in this case how the *Pickering–Connick* test ought to be applied in the particular circumstances of judicial-staff relationships of the court in question here or of any other court. No such question is presented to us here and the wide variety of staff arrangements now employed by various tribunals, state and federal, counsel against such a broad-stroke approach. We hold only that, at the time he acted, Justice Lund had a reasonable basis for his conclusion and therefore could invoke the protection of qualified immunity.

### B. *Supplemental Jurisdiction Claim*

Appellants Pratscher and Wilgenbusch ask us to dismiss Mr. Gregorich's defamation claim if we find Justice Lund entitled to qualified immunity. They note that, in the absence of any claims against Justice Lund, no federal issues will remain in this case. Mr. Gregorich argues that we should retain the defamation claim. He contends that the district court has expended substantial resources on the issue, that no further discovery is necessary, and that he might not get a fair trial in state court because he is suing state court employees.

We believe that this matter ought to be addressed by the district court. Under the governing statute, 28 U.S.C. § 1367, the district court must determine whether to exercise supplemental jurisdiction over the claim. In this case, the district court has not had an opportunity to consider whether it should retain the defamation claim in the absence of Mr. Gregorich's federal constitutional claims. Accordingly, we remand the defamation claim for this purpose. *See* 28 U.S.C. § 1367(c)(3) (stating that "[t]he district court may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction").[9]

### Conclusion

For the foregoing reasons, the district court's denial of qualified immunity to Justice

---

8. *See* Tr. IV at 75 (reproducing Justice Lund's deposition testimony, in which he claimed that before the Teamsters withdrew the petition they had filed with the Illinois Labor Relations Board, he believed the Board would refuse to recognize a bargaining unit of research attorneys because of "the confidential relationship" they had with the judges of his court); *see also* Tr. IV, Ex. 4 (reproducing 1987 letter from one appellate court justice to all staff members which stated that "in-house close contact" among judges and staff members was needed "to ensure a good work product" and that "[a]ll suffer if there is a breakdown").

9. *See Timm v. Mead Corp.,* 32 F.3d 273, 276–77 (7th Cir.1994) (discussing factors that should in-

form district court's inquiry in such circumstances); *cf. Eubanks v. Gerwen,* 40 F.3d 1157, 1162 (11th Cir.1994) (noting that all federal claims had "been disposed of rather early on at the summary judgment phase," and remanding with instructions that the district court "should carefully consider whether to dismiss, without prejudice" the remaining state law claim); *Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 192 (7th Cir.1993) (dismissing all federal claims and remanding with instructions that district court apply § 1367(c) to determine whether further federal proceedings on supplemental claim were appropriate).

Lund is reversed. He has the protection of qualified immunity against suit for damages. The supplemental claim against appellants Pratscher and Wilgenbusch is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.